AUG 2 2023 PM2:28
FILED - USDC - BPT - CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE USE OF A CELL-SITE SIMULATOR TO LOCATE THE CELLULAR DEVICES ASSIGNED CALL NUMBERS 475-321-1036 and 203-434-5964 | No. 3:23mj 673 (SDV)<br><br>**Filed Under Seal** |

I, Michael Oppenheim, depose and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, known as a Cell Site Simulator, which is described in Attachments B-1 and B-2, to determine the location of the cellular device assigned call number 475-321-1036 ("**Subject Telephone 1**"), which is described in Attachment A-1, and the cellular device assigned call number 203-434-5964 ("**Subject Telephone 2**"), which is described in Attachment A-2 (collectively, the "**Subject Telephones**"), for the purpose of locating ANTWAN HILL and NYZAIRE BARNES and executing currently pending arrest warrants.

2.       The subscriber for **Subject Telephone 1** is Roderick Hill, 175 Elaine Terrace, New Haven, CT, and the service provider is **Cellco Partnership d/b/a Verizon Wireless**, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, NJ 07921 (the "Service Provider"). As a provider of wireless communications service, the Service Provider is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15). I believe ANTWAN HILL is the primary user of **Subject Telephone 1**.

3.       The subscriber for **Subject Telephone 2** is Nyzaire BARNES, 6 Savoy Street, Unit E, Hamden, CT, and the service provider is **AT&T**, a wireless telephone service provider

USAO_010249

headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408 (the "Service Provider"). As a provider of wireless communications service, the Service Provider is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15). I believe that NYZAIRE BARNES is the primary user of **Subject Telephone 2**.

4.     I am a Special Agent employed by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  As such, I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code; that is, an officer empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Section 2516 of Title 18.

5.     Prior to the ATF, I was employed by the United States District Court for the Southern District of New York as a United States Probation Officer. I am a graduate of the Criminal Investigator Training Program and the ATF Special Agent Basic Training program, both of which are conducted at the Federal Law Enforcement Training Center in Glynn County, Georgia. I hold a Bachelor of Arts Degree in Psychology from the University of Pennsylvania and Master of Arts Degree in Organizational Psychology from Columbia University.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     I have received specialized training in firearms identification and the investigation of firearms-related offenses. I have participated in investigations involving the unlawful possession of firearms by prohibited persons, including persons who are previously convicted felons; the possession of firearms in furtherance of the distribution of narcotics; and the use of

USAO_010250

firearms in the commission of violent acts. I have participated in investigations involving individuals who unlawfully possess firearms, of individuals illegally selling firearms, and of individuals distributing illegal drugs.  As such, I have coordinated the controlled purchases of illegal narcotics and participated in controlled purchases of firearms utilizing confidential sources, cooperating witnesses and undercover law enforcement officers; written, obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the illegal possession and distribution of firearms and narcotics; conducted electronic and physical surveillance of individuals involved in illegal drug distribution; analyzed records documenting the purchase and sale of firearms and illegal drugs; provided testimony, both in Grand Jury proceedings and District Court proceedings; and spoken with informants and subjects, as well as local, state and federal law enforcement officers, regarding the manner in which individuals obtain, finance, store, manufacture, transport, and distribute their illegal firearms and drugs.  In addition, I have been involved in the investigation of street gangs, including gangs with a national presence as well as locally based gangs. I have received training, both formal and on-the-job, in the provisions of the federal firearms and narcotics laws administered under Titles 18, 21 and 26 of the United States Code.

7.      I have participated in this investigation and, as a result of my participation and information received from other law enforcement officers, I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit. The statements contained in this affidavit are based on: (1) my personal participation in the investigation; (2) information provided to me by Special Agents/Task Force Officers of the ATF, (3) my experience and training.

USAO_010251

8.     This affidavit includes only those facts which relate to the need for, and propriety of, the requested authorization.  This affidavit does not purport to set forth all of the facts gathered during the course of the investigation of this matter.

9.     Because these warrants for the prospective collection of information, including cell-site location information, may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrants are also designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

10.    One of the purposes of applying for these warrants is to determine with precision the locations of the **Subject Telephones**.  On July 27, 2023, the Honorable S. Dave Vatti, U.S. Magistrate Judge for the District of Connecticut, authorized a warrant for location data for **Subject Telephone 2**, and on July 28, 2023, the Honorable S. Dave Vatti authorized a warrant for location data for **Subject Telephone 1**.  I served both Service Providers with the appropriate warrants and determined that both **Subject Telephones** are pinging – that is, being located in – the greater New Haven, CT area.

11.    On or about August 2, 2023, a grand jury returned a superseding indictment charging HILL, BARNES, and seven other individuals with RICO conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963(a). Arrest warrants for HILL and BARNES issued the same day, and law enforcement currently is attempting to locate HILL and BARNES for the purpose of executing those arrest warrants.

12.    While law enforcement continues to conduct surveillance at various times of the day, and has, in fact, determined the primary residences for both HILL and BARNES (the users of

USAO_010252

the **Subject Telephones**), the location data provided by the Service Providers to date related to the **Subject Telephones** has been insufficient on its own to reliably locate HILL and BARNES for purposes of executing the arrest warrants.  For example, the majority of the location data provided for the Subject Telephones has occurred with an error range of over 3,000 meters – a circle that encompasses entire neighborhoods in New Haven.   The smallest error range radius is approximately 593 meters – which also encompasses a large swath of land.  Many of the pings simply report back with no data, while the balance of the ranges are still over 1,000 meters.

13.     As part of this investigation, law enforcement has been receiving information about members of the Exit 8 gang, including, but not limited to, BARNES and HILL, from a cooperating witness (CW), who has provided information that has been corroborated by other sources and who has testified before the grand jury pursuant to a grant of immunity.  The CW has recently advised that members, to include BARNES and HILL, are aware of the investigation into the gang and believe they will be arrested soon.  ████████████, this has made some members, to include BARNES, make statements that the group should maximize their gang activities, such as shootings and taunting opposition members, until if and when they get arrested.  Many in the group agreed in principle. The CW has indicated a belief that BARNES and HILL are currently in possession of firearms, and within the past two weeks, BARNES sent a picture, via **Subject Telephone 2**, of his three firearms to ██ ██  I have also observed a video which I believe to have been recorded within the past week in which Exit 8 gang members, to include BARNES and Devin SUGGS an Exit 8 member who also has been charged in the superseding indictment, can been seen brandishing and displaying their firearms.

14.     Additionally, ████ recently advised me that many Exit 8 gang members, to include BARNES and HILL, have recently began hanging out at locations either in the Tre section

USAO_010253

of New Haven (an area considered generally friendly to Exit 8) or within outdoor areas in Exit 8 late at night into the morning, such as until 5:00 a.m. or 6:00 a.m.  While the data obtained from the previously issued search warrant related to the **Subject Telephones** so far does show some late night into morning activity, and, at times, general locations for BARNES and HILL apparently not near their residences, the imprecision of the location data has hampered law enforcement's ability to determine their locations in any meaningful way to allow for the execution of the arrest warrants.

### PROBABLE CAUSE

15.    The ATF and other federal and local law enforcement agencies are currently investigating DEVIN SUGGS, a.k.a. "JB"; NYZAIRE BARNES, a.k.a. "Melo"; ANTWAN HILL, a.k.a. "Bandz"; JAEDYN RIVERA, TYJON PRESTON, SAMUEL DOUGLAS, KIVEON HYMAN, QUAYMAR SUGGS, DONELL ALLICK, and others, known and unknown, for possible violations of the Title 18, United States Code, Section 1962(d) and 1963(a) (Racketeering Conspiracy); Title 18, United States Code, Section 1959(a)(3), 1959(a)(5) and 1959(a)(6) (VCAR Assault with a Dangerous Weapon, VCAR Attempted Assault with a Dangerous Weapon, and VCAR Attempted Murder); and Title 21, United States Code, Section §§ 841(a)(1), 841(b)(1)(B), 841(b)(1)(C), and 846 (Conspiracy to Distribute and to Possess with Intent to Distribute Fentanyl and Cocaine) (hereafter referred to as the "Target Offenses").

16.    In an indictment returned on March 22, 2022, a federal grand jury charged JAEDYN RIVERA, TYJON PRESTON, SAMUEL DOUGLAS, QUAYMAR SUGGS, KIVEON HYMAN, and DONELL ALLICK with racketeering conspiracy, with specified overt acts in furtherance of the enterprise including drug conspiracy; the June 16, 2018 attempted murder of Christopher Standberry; the January 24, 2019 attempted murder of Marcus Lloyd; the July 14, 2020 attempted murder of Shavarius Smith.; the April 27, 2021 attempted murder of Robey Smith; the May 3, 2021 attempted murder of Jaime Middlebrook and Milton Lloyd; the May 10, 2021

USAO_010254

attempted murder of Joseph Vereen; the May 11, 2021 attempted murder of rival gang members; the May 19, 2021 murder of Tashawn Brown; the May 20, 2021 attempted murder of rival gang members; the May 20, 2021 attempted murder of Kevin Kelly and Lawrence Deloatch; the June 30, 2021 attempted murder of Damion Lofters; and the September 16, 2021 murder of Kenneth Cloud. *See United States v. Rivera et al.*, 3:23CR56(VAB).

17.     On August 2, 2023, a federal grand jury returned a superseding indictment adding DEVIN SUGGS, BARNES, and HILL as defendants and also enumerating additional overt acts including the September 26, 2020 attempted murder of Kerwin Romero; the May 14, 2021 attempted murder of Charles Wearing; the May 17, 2021 attempted murder of rival gang members; the May 19, 2021 conspiracy to murder Tashawn Brown; the July 5, 2021 murder of Ciera Jones; the August 29, 2021 attempted murder of Nathaniel Couvertier and Zaumarah Nunez; the March 16, 2022 attempted murder of rival gang members; the April 12, 2022 attempted murder of rival gang members; the January 20, 2023 theft of a black BMW from Scarsdale, New York; and the January 20, 2023 attempted murder of Trayvon Hunter. Arrest warrants for DEVIN SUGGS, BARNES and HILL were issued on August 2, 2023.

### The Exit 8 Gang

18.     The Exit 8 gang is a local street gang named after the geographic area accessed by exiting Interstate 91 at Exit 8 in New Haven, Connecticut.  Members of this gang typically reside in, or have previously resided in, this geographic area, which is often referred to as "the 8."  The area of Exit 8 includes several small housing projects off the Route 80 corridor, which are located on two major thoroughfares, Eastern Street and Quinnipiac Avenue.  In recent years, this area has been riddled with shootings, murders, shots-fired incidents, and violent crimes.  Members of Exit 8 have long-standing issues with other neighborhood gangs within the city, specifically gang members from the Hill section of New Haven, dating back to 2014 and 2015, although violence

USAO_010255

has increased in recent years.  Violence between these groups is retaliatory in nature, and members of Exit 8 are believed to be responsible for a number of nonfatal and fatal shootings in the Hill section of New Haven.  Exit 8 has also been involved in a gang dispute with individuals associated with the "G," known to investigators as the former Farnam Courts Housing Complex located in New Haven.

19.     Members of the Exit 8 group/gang identify themselves by the numbers "8" and "88," and they often utilize the symbol of an eight ball.  These symbols are found in social media posts, on clothing, and in group members' tattoos, and they are used to show allegiance to the group/gang.  More recently, younger members of Exit 8 are identifying themselves with the word "Honcho."  This derives from the nickname of Dashown "Honcho" Myers (YOB 2001), an Exit 8 member who was murdered on February 23, 2020, on Quinnipiac Avenue and who has been glorified posthumously by the group.  This younger sect of the Exit 8 gang, which refers to itself as the "Honcho Gang," is involved in firearms violence and the theft of motor vehicles.

20.     The below is a map providing a rough depiction of the territory controlled by the Exit 8 gang.



Page **8** of **36**

21.     Based on the investigation conducted to date, including but not limited to arrests of and seizures made from gang members and associates; debriefings of arrestees, confidential informants, cooperating defendants, and cooperating witnesses; examination of information derived from cellphone extractions; and the review of social media, the investigation has revealed that Exit 8 members have been involved in violence involving other rival gangs and that they often shoot at/kill rival gang members.

22.     Amongst members of Exit 8, rival gang members are referred to as the "Opps" or "opposition."  Social media platforms—including Facebook, Snapchat, and Instagram—are used by gang members on both sides to post pictures of themselves with narcotics, to promote their gang, threaten rival gang members, incite violence, to celebrate acts of violence, reveal or intimidate potential cooperators/witnesses, and to post pictures and videos of themselves posing with firearms.  Social media platforms are also used to coordinate narcotics sales, to sell and trade firearms, and to plan and coordinate acts of violence.  Shootings and murders raise the status of an individual gang member within the group and further his reputation within the gang.

23.     Law enforcement has identified a number of shootings in New Haven that are believed to be attributable to the Exit 8 gang, based on information gathered to date including National Integrated Ballistic Information Network (NIBIN) information regarding a Ruger LCP .380 firearm recovered on May 21, 2021, from Jaedyn RIVERA, and a 9mm firearm recovered on August 12, 2021, from Exit 8 associate Rolando McKay known to have been used by PRESTON and other Exit 8 gang members, and other firearms.

24.     Several of the incidents alleged in the superseding indictment involving BARNES and HILL are described in greater detail below.  Although I am focusing on these incidents in this

USAO_010257

warrant, this is not a complete accounting of BARNES's or HILL's involvement in the Exit 8 gang, and the investigation is continuing into additional acts.

**September 26, 2020, Attempted Murder of K.R.**

25.     ██ ███ ████████████ █████████ █████ █ ██

████████     During September 2020, PRESTON was driving a car and HILL was in the backseat when they found an opposition gang member, K.R. (from the "G") near Roberto Clemente School in New Haven. HILL tried to shoot K.R. from a few of feet away while in the car firing 5-7 shots but did not succeed in hitting him. NHPD has confirmed this incident as a shots-fired incident on Kossuth Street and Ann Street. The CW said that this attempted shooting was committed by HILL to further his status in the gang by killing an opposition gang member.

26.     On August 23, 2022, the Honorable U.S. Magistrate Judge S. Dave Vatti, District of Connecticut, authorized a search warrant for five Instagram accounts, to include Instagram account ID # 31600710419, username "dropemjb," and Instagram account ID # 36371158552, username "_getitgoin_." (see 3:22mj711[SDV]). Based on a detailed review of the accounts, as well as other social media accounts and seized cellular telephones related to other Exit 8 gang members, law enforcement determined that these accounts were used by Devin SUGGS. Also authorized by the search warrant was Instagram account ID # 2999347973, username "Tj frmthablock," which proved to be used by Tyjon PRESTON.

27.     From within one of Devin SUGGS' accounts, I observed a large group chat, that according to the data provided, spanned the time period from April 16, 2021, through May 4, 2021, and included Devin SUGGS, Quaymar SUGGS, Antwan HILL, Nyzaire BARNES, Tyjon PRESTON, Tyrone FELTON, Jose MOREL, Jaylon CROCKER, Ja'sean STEVENSON, and others.

28.     During a portion of the conversation on May 4, 2021, the following took place:

USAO_010258

HILL:            Ok passitup

HILL:            "Here take it"

BARNES:          You should have a body rn

BARNES:          U meady asFuck

Q. SUGGS:        Damnnn

HILL:            U don't even have attempted

Q. SUGGS:        Oouuu

BARNES:          Quay

Q. SUGGS:        Yes melo

HILL:            U don't have nun u shouldn't be able to talk

BARNES:          Quay got better aim den u

HILL:            Go do sum b4 u talk to me

HILL:            Janiya u too

[Deleted account]:   wow melo so yu sayin quay meady meady

BARNES:          No

BARNES:          He meady

BARNES:          Bouta call u MB meady boy

HILL:            U pass your pole u can't never talk to me ab anything

Q. SUGGS:        To mb

[Deleted account]:   trust me gang i wont b sliding out no v wit my blixk

Q. SUGGS:        ?????

HILL:            U saw da opps Nd passed your pole

BARNES:          U missed 8 shots under 5 feet

USAO_010259

| | |
|---|---|
| BARNES: | That's sad |
| HILL: | U was there? |
| Q. SUGGS: | Guys stop talking like this in my grouper |
| [Deleted account]: | hotttt |
| [Deleted account]: | boyssss |
| HILL: | U can't merch it was 5 feet |
| HILL: | How many touches u got melo? |
| [Deleted account]: | but stay someone federal look at yu cops |
| BARNES: | Everybody said ya was on the side of him |
| [Deleted account]: | sayin |
| BARNES: | UNDER 5 FEET |
| HILL: | Merch it |

. . .

| | |
|---|---|
| BARNES: | COME ON MB STOP CAPPN |
| HILL: | Merch it was 5 feet |

. . .

| | |
|---|---|
| HILL: | Can't talk to me if u never did a drill worda eddie |
| HILL: | ? |
| BARNES: | Under 5 feet tho gang? |
| HILL: | ? |
| BARNES: | Smh |

. . .

| | |
|---|---|
| BARNES: | FUCKING MEADY |
| HILL: | How many touches do U have? |

USAO_010260

| Q. SUGGS: | Don't matter how far he was he was right thereeeeee |
| MOREL: | oouuu melo big dawg now |
| BARNES: | Y u miss? |
| BARNES: | !!!!! |

29.    Based on my training and experience and participation in this investigation, I believe that in this portion of the conversation, the group was discussing the fact that HILL was involved in a shooting and missed his intended victim(s) at a range of five feet.  The conversation grew argumentative, in that other gang members asked how many "touches" others had and said that they should not be judging if they have not been involved in "touches."  Based on my training, experience, and involvement with this investigation, I know "touches" and also "drilling," which is also used in this conversation, both refer to shooting someone.  There are also messages related to when one of the group has passed off or given up a "pole," which I also know to mean a firearm.

30.    I have since learned through my investigation that this portion of the conversation was specifically about the September 26, 2020, incident wherein HILL attempted to shoot at K.R., but missed from close range.  Because HILL and BARNES were "DMing," or sending private messages on social media, in this case, via Instagram, and were speaking about an incident that had happened, I believe that HILL and BARNES participated in this conversation using their cellular devices.

**May 14, 2021, Attempted Murder of C.W.**

31.    On May 14, 2021, at approximately 9:22 p.m., NHPD officers responded to 42 Kossuth Street (within the Hill section of New Haven, an area which is rival gang territory for the Exit 8 gang) for the report of probable gunshots via the activation of ShotSpotter.  Officers subsequently located shooting victim C.W., who had been shot four times – twice in his left leg,

USAO_010261

and once each in his torso and right leg. Officers located six .380 caliber fired cartridge casings (FCCs) on scene.

32.     After the incident, C.W. provided several accounts of what had occurred and was largely uncooperative. In one sworn account, he advised that, on the night of incident, he was leaving his uncle's house to go to a Jamaican restaurant when he was shot. C.W. testified that he saw two masked individuals walking towards him on the same sidewalk. When he saw them, he asked, "Who's that," but they did not respond. He believed both individuals shot at him because he was later told that he had two different calibers of bullets in his body.

33.     Eyewitnesses reported hearing four or five gunshots and seeing C.W. on the ground after he was shot. One of the witnesses drove C.W. to the hospital and provided sworn testimony that he/she had previously overheard C.W. and his family members talking about the ongoing feud between the Hill and Exit 8 gangs. The witness testified that C.W. told him/her that a white vehicle had pulled up next to him and shot him. The witness came to believe that C.W. knew who shot him, particularly as the witness had observed a white vehicle speed away from the scene.

34.     During a post-arrest interview on May 22, 2021, discussed in more detail below, RIVERA stated that that two people shot at "Chuck" (believed to be C.W.), one with the .380 caliber pistol that RIVERA was arrested with and one with a .38 caliber firearm.

35.     The previously referenced CW provided sworn testimony and advised that Devin SUGGS and RIVERA had both told the CW that they had done this shooting. The CW indicated that RIVERA had the .380 caliber pistol or a revolver at that time. █████ █████████ █████████

██ ████████████ █████████████████████ ██████ ████ ████ ████████ ██

██████ ██████████. For this shooting, RIVERA and Devin SUGGS had met up and went to the Hill section of New Haven, where they saw C.W. RIVERA told the CW that they got out of the

USAO_010262

car, "walked up on Chuck," and shot him. Devin SUGGS told the CW that he was there, but that he was not the shooter and had hung back. According to the CW, C.W. was shot for being associated with the rival Hill gangs.

36.     NIBIN analysis revealed that the .380 FCCs recovered from this incident were fired by the Ruger LCP .380 that was recovered on May 21, 2021, during the arrest of RIVERA and Devin SUGGS, with Charles Phillips also present but apprehended at a later date. NIBIN analysis indicates that that this firearm also fired the FCCs recovered at six other Exit 8 shootings spanning April 27, 2021, through May 20, 2021, many of which are charged in the superseding indictment.

37.     At the time of his arrest, as indicated above, law enforcement seized a cellular telephone from Devin SUGGS; law enforcement obtained a state and then a federal search warrant for the device.  A review of Devin SUGGS' cell phone revealed multiple text messages related to this incident. On May 14, 2021, the day of the shooting, at 7:13 p.m. RIVERA told Devin SUGGS that he needed a driver when it got dark, then asked what "V" (vehicle) he had at 7:15 p.m.  Devin SUGGS answered "Camry" at 8:18 p.m.  Meanwhile, at 7: 48 p.m., "Step" asked Devin SUGGS where he was. Devin SUGGS answered he was headed back to the "8," and then "Step" asked what Devin SUGGS was doing and who he was with. Devin SUGGS answered, "park this up, Ds got on us." Finally, at 8:49 p.m., HILL asked Devin SUGGS who he was with, and Devin SUGGS responded "Jae n tj" at 8:50 p.m., indicating he was with RIVERA and PRESTON. Three minutes later, HILL asked if they could bring him to Hamden and, at 8:53 p.m. Devin SUGGS responded, "igh hold on." This exchange leads me to believe that PRESTON may have also been present at this attempted murder. Based on the proximity in time between the request to be brought to the shooting location and the shooting, I believe that these individuals, to include HILL, SUGGS and

USAO_010263

PRESTON carried their phones during the incidents and there is probable cause to believe that they always carry their phones when committing acts of violence.

38. I am aware of Facebook Messenger messages sent by RIVERA beginning at approximately 8:24 a.m. on May 20, 2021 (a week after the shooting). RIVERA taunted Facebook user "Tyesha Ra'Nae," identified to be Tyesha Gardner, and took credit for shooting C.W. RIVERA wrote Gardner, "lmk how ya bro doing too, 'gws' [get well soon]." Later, he says, "Shit tell chuck get up, he know wassup," specifically referencing C.W. RIVERA then stated, "now I'm telling you tell chuck I said gws," and Gardner responded, "He ALIVE shot 7 times and living G." RIVERA's response, which I interpreted to be him taking credit for the shooting, was: "I know how many times he got shot." I know from my training, experience, and involvement in this investigation, that many Exit 8 gang members, to include RIVERA, have a pattern of communicating with opposition members and their associates to taunt them and take credit for acts of violence committed by Exit 8 members. Again, these communications show that Exit 8 gang members including HILL and Devin SUGGS rely on their cellular devices to communicate and discuss acts of violence.

**May 19, 2021, Homicide of T.B.**

39. On or about May 19, 2021, at 8:00 p.m., officers responded to the area of Ella T. Grasso Boulevard and Stanley Street in response to a report of shots fired. ShotSpotter had activated to three rounds at 70 Stanley Street and four rounds at 1319 Ella T. Grasso Boulevard at 7:59 p.m. One victim, T.B., suffered a gunshot wound to his abdomen and ultimately died due to his injury. Video surveillance showed a black sedan pull onto Stanley Street from Ella T. Grasso Boulevard and park in front of 71 Stanley Street. The victim and three unidentified males exited the black sedan and walked west toward the Boulevard. The males then stopped in front of 1307

USAO_010264

Ella T. Grasso Boulevard when a silver car drove north on the Boulevard and appeared to shoot in their direction. The victim fell to the ground and the three other males ran back toward Stanley Street.

40.     Witnesses also described a black Nissan Sentra parked in front of a white Lincoln SUV at 71 Stanley Street. After the witnesses heard gunshots, three younger black males wearing ski masks were seen running and entering the black Nissan Sentra and driving away. Other witnesses stated that the male who was believed to have shot the victim was from the Exit 8 area.

41.     Officers located .380 FCCs on Ella T. Grasso Boulevard between Stanley Street and Edgewood Avenue. NIBIN analysis of those FCCs indicated that two separate .380 firearms were used in this shooting, one of which is linked to a number of other attempted murders committed by Exit 8 gang members. Officers also located 9mm FCCs at this incident that were linked to one murder and one attempted murder believed to be committed by Exit 8 gang members.

42.     Law enforcement has interviewed an individual, who will be referred to herein as Witness 1, about this murder. Witness 1 stated that he/she was at Edgewood Park with his/her family and extended family having a BBQ when A.G. and T.B. got into a physical altercation with other young males to include known Exit 8 gang members, Quaymar SUGGS and Hector Delgado. A.G. had previously had a problem with Quaymar SUGGS, as he had been jumped by Quaymar SUGGS. Later that same date, Witness 1 stated he/she observed a black sports utility vehicle (SUV) being driven by a black male, subsequently identified as HILL, and an Hispanic male, subsequently identified as Delgado seated in the front passenger seat. Witness 1 was able to identify these individuals. He/She said that Delgado exchanged words with Witness 1 and other family members until the black sports utility vehicle finally left.

USAO_010265

43.     Another witness, referred to herein as Witness 2 said that he/she saw Quaymar SUGGS shoot T.B.  He/She also described the second shooter who was a man with braids, which were described as either "Pop Smokes" or "ASAP Rocky" braids, shooting from the back passenger window.  Video surveillance confirms the witnesses' version of events as does a Facebook live video obtained from a third witness, (hereinafter "Witness 3") of the fight and barbeque prior to the shooting.

44.     Recently the CW advised ATF of the following:  The T.B. homicide was a result of the fight at the barbeque, as described by other witnesses.  While three firearms were used in the shooting, Quaymar SUGGS, armed with both a Glock (believed to be a 9mm) and a .380 caliber Ruger later recovered from RIVERA on May 21, 2021, was one of the shooters. PRESTON, wielding the second .380 caliber pistol, was the other shooter.  Two other people were in the vehicle responsible for the shooting; Ja'sean STEVENSON and HILL.

45.     According to the CW, after the shooting, PRESTON, who was with Quaymar SUGGS, STEVENSON, and HILL explained that they had "caught one," and appeared to be very excited, and would not calm down.  After the shooting, PRESTON and Quaymar SUGGS left town for a while.

46.     The witness statements described above indicate that HILL and QUAYMAR SUGGS were present during the altercation, left the park, and then returned.  The victim also had left the immediate area of the altercation and returned on scene around the time of the shooting. Based on my training and experience and participation in this investigation, I believe that for HILL, QUAYMAR SUGGS, and PRESTON to come to the park soon after the altercation and locate the victim, they likely received a cellphone communication that the victim was on scene, whether by message or by call, which will be contained in the call log.

USAO_010266

47.     NIBIN analysis of the .380 FCCs discussed above indicated that they were fired by the same firearm as the shell casings recovered from the other incidents. Officers also located another set of .380 FCCs linked to an unrecovered firearm. The 9mm FCCs from this shooting were linked to one shooting from 2020 and multiple Exit 8 incidents between May 19, 2021, and July 5, 2021, including a June 30, 2021, attempted murder at 161 1st Avenue and the July 5, 2021, homicide of C.J. at 61 Truman Street.

**May 20, 2021 Attempted Murder of Rival Gang Members at 168 West Street**

48.     On May 20, 2021, at approximately 2:14 p.m., ShotSpotter alerted to shots fired at 168 West Street in New Haven.  Officers found twelve 9mm FCCs on the sidewalk in front of 174 West Street, as well as a mix of .380 and .45 caliber FCCs and a bullet fragment at the intersection of Congress Avenue and West Street.  Two witnesses said they heard gunshots but did not see anything—one was a resident who lived nearby, the other was the owner of a vehicle that was struck by gunfire.

49.     A camera at the Congress & West intersection captured some video footage of the incident.  The video shows a dark-colored BMW driving northeast on Congress, passing West Street, and then abruptly pulling over to the right shoulder and parking.  Two males immediately exited the BMW and run toward the Congress & West intersection, out of view.  One of the males exited from the rear passenger-side door and appeared to be a Black male wearing a black mask, white t-shirt, light-colored shorts, and dark-colored sneakers; this male appeared to be holding a handgun in his right hand.  The other male, who exited from the rear driver's-side door, appeared to be a white or Hispanic male wearing a black mask, white t-shirt, white pants, and white sneakers. Shortly after the two men exited the frame, they reentered the frame running back to the BMW and got back into the same rear side doors they exited from.  The BMW then drove away on Congress.  The vehicle appeared to have an emblem or a sticker on the left side of the license plate.

USAO_010267

50.     Soon after, a TFO who had reviewed the video footage saw a dark BMW with four males in the car and with a distinct sticker or emblem on the left side of the rear plate driving in New Haven.  A registration query revealed that the car had been stolen from Fairfield.  Law enforcement attempted to stop the BMW at an intersection, but it eluded officers and drove recklessly onto I-95 South, at which point, officers terminated pursuit.

51.     NHPD personnel who are familiar with gangs/groups in New Haven, and in particular with members of Exit 8 and the Hill, later reviewed the footage from the shooting and observed that the lighter-skinned male fit the description of RIVERA while the darker-skinned male holding the handgun fit the description of PRESTON, based on previous encounters the detective had with both RIVERA and PRESTON.

52.     RIVERA and Devin SUGGS were apprehended by NHPD on May 21, 2021, with the stolen BMW.  During that incident, law enforcement recovered a loaded black Ruger LCP .380 handgun with serial number 372-35841, which was reported stolen from Stratford in 2018, from RIVERA and a black/brown FN .32 caliber handgun, serial #496172.  The NIBIN analysis of the Ruger recovered from RIVERA has been referenced above.  RIVERA later spoke with law enforcement on May 22, 2021, after signing and dating the NHPD's *Miranda* form and admitted his involvement in the Congress & West shooting but would not provide the names of any other individuals involved in the incident, however, he advised that a total of four people, himself and three others were involved in this shooting, as well as second shooting that occurred later that evening.

53.     NHPD personnel familiar with Exit 8 members later reviewed the footage from the shooting and observed that the lighter-skinned male fit the description of RIVERA while the darker-skinned male fit the description of PRESTON. Detectives then viewed RIVERA's

USAO_010268

Facebook, "Jae Honcho," and observed a photograph of RIVERA, PRESTON, and Devin SUGGS that had been posted on May 20, following this shooting.  RIVERA was wearing clothing that matched the clothing worn by the light-skinned male from the surveillance video, and PRESTON was wearing clothing that matched the clothing worn by the dark-skinned male in the video. Devin SUGGS was wearing jeans and a white t-shirt that had a pattern in diagonal stripes across the shirt and his hair was in braids. The caption to the photograph was, "Got the drop on Honchogang I suggest you don't pull up." The detective also saw that RIVERA's Facebook stories had a video of RIVERA and PRESTON sitting in the back of a moving car wearing clothing similar to the two males seen in the video of the shooting. The BMW that was later recovered has the same color interior as the car in this video. The videos were created at approximately 2:41 p.m. and 2:50 p.m., approximately half an hour after the shooting.

54.     As part of this investigation, ATF obtained a search warrant for RIVERA's Snapchat account.  A review of the account showed that RIVERA had created four videos from approximately 4:38 p.m. through 5:38 p.m.  The first video shows two people in the back of a vehicle consistent with the recovered BMW, each wearing clothing matching that of the two shooters. I believe the featured persons to be RIVERA and PRESTON.  The second video appears to be a truncated version of the first video. The third video, now within a residence, shows Quaymar SUGGS in a mask and hooded sweatshirt apparently filming in selfie mode.  Devin SUGGS can be seen in the background with a firearm and a patterned white T-shirt which matches the shirt he is wearing in RIVERA's Facebook post.  RIVERA can also be seen sporting a white T-shirt.

55.     In the final video, RIVERA appears unmasked holding two black firearms, one with a red laser. I believe that these two firearms are consistent with a .380 and a .45, which matches

USAO_010269

the FCCs found on scene. RIVERA is wearing the same white t-shirt as in the first and third videos.

In the background, Devin SUGGS is visible along with an individual with a black ski mask, white

t-shirt, and light-colored shorts, consistent with PRESTON and his clothing during the shooting.

56.     A review of Devin SUGGS' cell phone showed messages with a telephone number

ending in 8134, related to this shooting, wherein he appears to advise that he was with PRESTON,

Quaymar SUGGS, and RIVERA, and that they need a place to hide:

| 5:16 pm | 8134: | How long u need to stop? |
|---------|-------|--------------------------|
| 5:16 pm | 8134: | And who u wit |
| 5:16 pm | SUGGS: | me tj quay n jae |
| 5:17 pm | 8134: | And how Long u need to stop ? |
| 5:17 pm | SUGGS: | I needa stay til it get dark |
| 5:17 pm | 8134: | All y'all ? |
| 5:18 pm | SUGGS: | Yea |
| 5:19 pm | 8134: | Damn |
| 5:19 pm | 8134: | Ight how long y'all could wait ? |
| 5:29 pm | SUGGS: | Nvm |
| 5:29 pm | 8134: | Ur annoying |
| 5:30 pm | 8134: | Had me traveling back home for nothing |
| 5:33 pm | 8134: | Should've said it was a rush |
| 5:33 pm | 8134: | But Ight as long as y'all good and got somewhere to go |
| 5:33 pm | SUGGS: | Wasn't tryna scare you |
| 5:39 pm | 8134: | Nigga cf long as u not bringing me a body to hide then i wouldn't be scared .. and cf might not even be scared of that |

57.     Importantly, this exchange shows that Devin. SUGGS carries his telephone on his

person when engaging in acts of violence.  It also shows that Exit 8 gang members including Devin

SUGGS, communicate over their cellular devices, and use same to coordinate, or, in this case,

attempt to evade law enforcement, using a cellular device.

USAO_010270

58.     Based on RIVERA's statements that there were four people involved in this shooting, the social media posts and videos showing RIVERA, PRESTON, Quaymar SUGGS and Devin SUGGS together after the shooting, the messages from Devin SUGGS wherein he says he is with RIVERA, PRESTON and Quaymar SUGGS and in need of a hiding location until at least dark, I believe that RIVERA and PRESTON were the shooters, and that Quaymar SUGGS or Devin SUGGS was driver of the BMW, and that whoever was not driving was the front-seat passenger.

**July 5, 2021, Homicide of C.J.**

59.     On or about July 5, 2021, at 2:42 p.m., ShotSpotter alerted to three shots fired at 73 Truman Street in New Haven.  Upon arrival, officers located the victim on the walkway of 61 Truman Street suffering from a gunshot wound to the head. The victim later died due to her injuries.

60.     Surveillance cameras showed an SUV park on Clover Place west of Truman Street. Two individuals exited the vehicle and walked to the corner of Clover Place and Truman Street. Both individuals then began to shoot north on Truman Street, where the victim was located. Additional surveillance footage captured a plate for the vehicle, which was determined to be a Honda Pilot. A registration check indicated that the vehicle was stolen from Stratford. The Honda Pilot was recovered later that day on Lenox Street in New Haven and was observed to have a broken rear passenger side window as well as several FCCs inside the vehicle.

61.     Officers located seven FCCs on the southwest corner of Clover Place and Truman Street and eight FCCs on the northwest corner of the same intersection, in the area where the two men described above were shooting from.  These FCCs included 9mm FCCs.  NIBIN analysis of the FCCs shows that the FCCs were fired from the same firearm as a number of other incidents

USAO_010271

known or suspected to have been committed by Exit 8 gang members during the summer of 2021, including the murder of T.B. discussed above.

62.     Investigators later learned that the Honda Pilot that the suspects had been driving was equipped with a vehicle "infotainment" system that is Bluetooth compatible and that could be linked to any of the vehicle's occupants' cellular phones or smart devices and utilized for navigational or entertainment purposes.  Investigators seized the infotainment system pursuant to a state search warrant and determined that a device with the display name "iphone" had most recently connected to the infotainment system on July 4, 2021, at approximately 8:35 p.m.—the evening before.  MAC addresses are unique to a device and are typically established by the manufacturer of the device, here, Apple.  Records received from Apple revealed that the MAC address that had connected to the infotainment system was linked to Google accounts associated with BARNES. Investigators determined the telephone number associated with this account to be 203-893-6583.  While this telephone number was subscribed to Paul Smith out of Greenville, NC, I am aware that on August 8, 2020, BARNES sent an Instagram Direct Message in which he provided this number to be his cellular telephone number. In addition, this device was listed under the name of "Nyzaire Barnes" in information obtained from Apple.  This information indicates to me that BARNES was using his smart phone inside the stolen Honda Pilot around the time of the homicide, and that his device may include other evidence of his involvement including location information, communications, and other evidence.

63.     The CW provided sworn testimony that PRESTON and HILL were responsible for this homicide.  PRESTON told ▮▮▮ that PRESTON and HILL "walked down" on C.J. and shot her. PRESTON also told ▮▮▮ that he traded the Glock used in the murder to another Exit 8 associate, who observed that there was blood on the firearm.  The gun used in the homicide was

USAO_010272

given to Nygere Evans and the CW described the firearm as having a green frame, gold barrel, and a slotted slide. I also know that, pursuant to a search of PRESTON's telephone, on July 9, 2021, PRESTON searched for "how to clean blood off a gun" and "cleaning dried blood off a rifle." Investigators believe that PRESTON may have cut his hand on the glass from the broken window of the Honda Pilot.

### April 12, 2022 Attempted Murder of Rival Gang Members

64.    On April 12, 2022, at approximately 2:26 p.m. NHPD officers were dispatched to the area of 36 Goffe Street, New Haven for a ShotSpotter activation that indicated five rounds being fired. Officers quickly realized the incident occurred closer to 200 Goffe Street. A witness reported that the offending vehicle was a white crossover style SUV, with four unknown occupants, rear passengers having leaned out of the window and fired multiple shots in the direction of the 200 Goffe Street apartments.

65.    Officers subsequently located twenty-three FCCs on scene, and damage to the building nearest to Apartment E37. A review of available video footage showed a white Toyota Rav-4 traveling west on Goffe Street from Sperry Street at approximately 2:25 p.m. As the Rav-4 approached the E Building of 200 Goffe Street, the rear passenger windows of the Rav-4 lowered, and two rear seat passengers hung out of the vehicle's windows, pointed firearms toward 200 Goffe Street, and discharged them into the complex. The footage showed the Rav-4 then turning left onto Orchard Street, headed south bound toward Whalley Avenue.

66.    NHPD had been aware of a report of a stolen white Toyota Rav-4 bearing Connecticut Registration # BD-96780, out of Wallingford, on or about March 28, 2022. Officers confirmed that, at the time of the shooting, the Toyota had not been recovered and was still listed as stolen.

USAO_010273

67. NHPD investigators contacted Toyota Customer Service who were able to provide real time GPS pings for the stolen Rav-4. An officer located the vehicle parked at the Scott Ridge Apartments, located at 425 Eastern Street, New Haven, Connecticut (within the heart of Exit 8's territory) at approximately 6:29 p.m., however, law enforcement was not able to approach the vehicle. Through following the vehicle and Toyota providing real-time location information, officers subsequently observed the vehicle stop at the 7-Eleven located at 1795 Dixwell Avenue, Hamden, for a brief time. Officers then followed and used the provided location information to locate the vehicle parked in the parking lot of 184 Promenade Drive, Hamden, CT.

68. Officers conducted surveillance of the Toyota and at approximately 8:54 p.m., an NHPD Sargent observed three males, later identified as BARNES, HILL, and Natquan Swan, walking to the stolen Rav-4. Officers attempted to stop all three males, but all three immediately began running through the complex. After a brief foot chase all three were apprehended and three firearms, two Polymer80 PMFs and a Taurus, model G2S, 9mm pistol were recovered. Swan had been in possession of the Taurus firearm, and tossed it along his way while being chased, and investigators located it in the location that the pursuing officer had observed Swan re-adjusting his pants while running. Cell phones were seized from HILL's, BARNES's, and Swan's person incident to their arrest for possession of the firearms (again showing how Exit 8 gang members regularly carry telephones on their person). HILL was in possession of one of the PMFs which was fitted with a 50-round drum, and BARNES possessed the other PMF. Both were also arrested for possession of firearms. Swan was later charged, via warrant, for the shooting in state court.

69. On April 13, 2022, investigators went to the 7-Eleven located where the Rav-4 had stopped on April 12, 2022, to retrieve video footage of who was operating the Toyota Rav-4 at that time. Upon reviewing the footage, investigators observed SWAN exit the driver side of the

USAO_010274

vehicle and HILL exit the passenger side of the vehicle. Both HILL and SWAN were wearing the same clothing as during the shooting incident. It appeared that BARNES remained in the Rav-4 while stopped at the 7-Eleven.

70.      Shortly after the incident, NHPD detective Greg Dash obtained state search warrants for the cellular telephones recovered from HILL, SWAN, and BARNES, date limited to April 11 & 12, 2022. As of this date, all three search warrants have been executed, but the only device that has been successfully extracted was SWAN'S.  I have reviewed data from SWAN's device as part of this investigation.

71.      From within Swan's phone, I observed a conversation between Swan and "Jay," using telephone number (475) 254-1076 on April 12, 2022 (possibly truncated due to the state search warrant being limited to April 11 & 12, 2022).  Based on this investigation, I know telephone number (475) 254-1076, listed in Swan's phone as "Jay," to be used by Ja'sean Stevenson, an active Exit 8 member.  In the last captured message, Stevenson sent a screenshot of an On Scene Media post related to the shooting at 200 Goffe Street.

72.      Along with the image sent, Stevenson asked Swan "This ya."  While there is no apparent response by Swan, it appears that Stevenson had some reason to suspect Swan of having been involved in the incident. Again, this is an example of how Exit 8 gang members communicate over their telephones and the conversation also suggests that they keep their cellular devices on their person.

73.      The firearms recovered from Swan and BARNES were linked to FCCs found at the scene of the shooting at 200 Goffe Street, discussed above. The firearm recovered from SWAN also was linked to a shooting on December 23, 2021.

USAO_010275

74.      The Rav-4 and the three firearms were swabbed for DNA and results are pending. Eleven latent fingerprints were lifted from the Toyota Rav-4. Preliminary comparisons between those prints and HILL's fingerprint card showed that HILL's prints matched a latent print from the driver's door above the handle.  Based on my training and experience, and participation in this investigation, I believe that evidence of this 200 Goffe Street attempted murder will be found, like on SWAN's cellphone, on HILL's cellphone when it is accessed and reviewed.

**January 20, 2023, Vehicle Theft and Attempted Murder of T.H.**

75.      On January 20, 2023, at 12:39 p.m., Hamden Police responded to Mather Street regarding the report of a Silver 2010 Nissan Altima that was chased and shot at by a Black BMW SUV. New Haven Police received the same complaint involving the same two vehicles prior to them traveling into Hamden. Surveillance video showed that the Black BMW appeared to have a New York license plate and that it had chased the Silver 2010 Nissan Altima from New Haven to Hamden.

76.      Moments after the chase, the Silver Nissan was found unoccupied on Dixwell Ave./Arch St. after being involved in a multi-vehicle collision. Twelve spent shell casings were located on Mather Street. Numerous spent shell casings were also located in New Haven in the area where the Nissan and BMW travelled prior to entering Hamden.

77.      Later that day, at approximately 2:00 p.m., a black 2022 BMW SUV bearing New York license plates was located in the parking lot of 140 Mill Street in East Haven, CT. The BMW was reported stolen from the driveway of 41 Wynmor Road in Scarsdale, New York, on January 20, 2023. The BMW was towed from the scene and later processed with permission from the owner of the BMW. One spent shell casing was found on the exterior windshield/hood area.

USAO_010276

78.     An individual driving on the road at the time of the incident reported that a projectile fired from the Black BMW SUV traveled through the front of his windshield and exited the rear window, almost striking his head.

79.     Hamden PD officers later learned that a gunshot victim, T.H., arrived at St. Raphael's Hospital in New Haven for treatment. Medical staff advised that he had been struck in the back of the head with a projectile. T.H. is known to be a gang member that is considered to be in opposition to the Exit 8 gang.

80.     T.H. spoke with officers at the hospital. He said that he had left a friend who lives on Putnam Avenue in Hamden and began driving home in his silver Nissan Altima when he saw a silver Honda CRV do a turn and a black BMW SUV started following him. The BMW continued to follow him while shooting at him. T.H. believed that there were two or three males in the BMW. After being shot and crashing the car, he began walking and was picked up and brought to the hospital by a friend's father.

81.     After the BMW, a black 2022 X5 model, was reported stolen at 41 Wynmor Road in Scarsdale, New York, a gray 2022 Honda Civic that had been stolen from West Haven, Connecticut, was recovered in front of 8 Wynmor Road. This indicated that the people who stole the BMW likely traveled to Scarsdale in the Honda Civic. Additionally, Ring doorbell footage was recovered from the neighborhood in Scarsdale from which the BMW was stolen, which showed a male figure appearing to attempt to steal another parked car in the area.

82.     On January 20, 2023, Ring doorbell footage also was obtained from 140 Mill Street, Apt. 104 in East Haven, which showed that at 1:31 p.m., after the attempted murder, a black BMW was backed into a parking space. A tall, heavyset male, wearing a black, shiny, puffy jacket with gray pants and light-colored sneakers then exited the operator's seat of the BMW. A shorter

USAO_010277

slim male wearing a black hooded sweatshirt, dark mask, light-colored gloves, and dark sneakers exited the front passenger seat of the BMW. A female juvenile then exited the operator seat of the Toyota, and the shorter male took her place in the driver's side door. The taller male then entered the Toyota via the rear driver side passenger seat and the female entered the car on the rear passenger side.

83.     After responding to another stolen vehicle complaint, observing video footage of the thefts, and apprehending an individual who was driving that stolen car, Hamden Police determined that two juvenile females had stolen the Honda that was driven to Scarsdale from New Haven. After several recorded interviews, the two females ultimately admitted to being friends with "Spazz" and "Blitzz" and to picking them up in a Toyota Rav-4 on January 20, 2023, after the males parked the black BMW in the parking lot at 140 Mill Street in New Haven, Connecticut. The second female, Juvenile 2, also said that the shorter of the two males had a firearm with a long magazine on his person when he entered the driver's seat of the Toyota, and she provided her telephone and signed a consent to search form.

84.     From within Juvenile 2's telephone, law enforcement observed relevant Instagram conversations between her and Devin SUGGS on the date in question, including one in which Devin SUGGS said he was with J'Veil Outing at the time of the attempted murder. Juvenile 2 then admitted that Devin SUGGS was the male with the firearm who entered the driver's seat of the Toyota Rav-4 on January 20, 2023, and that Outing had been the other person with him.

85.     On March 23, 2023, Devin SUGGS was taken into custody on unrelated charges and an audio/video interview was conducted. During that interview, he stated that he was at Wilbur Cross High School on January 20, 2023, did not go to New York, and was not in the black BMW. Devin SUGGS did admit that he was friends with Outing and confirmed his Instagram profile.

USAO_010278

Hamden police checked records from the school and confirmed that Devin SUGGS was not in attendance on the date in question.

86.     Also on March 23, 2023, Outing was also interviewed after being arrested on unrelated charges. Hamden Police seized his cellular telephone at that time, suspecting that it contained possible evidence of both the theft of the BMW and the subsequent shooting of T.H.

87.     During the interview, Outing admitted that he drove the stolen Honda Civic (that the two juvenile females had stolen) to Scarsdale, New York, with Devin SUGGS, BARNES, and others.  Outing confessed that, once they reached New York, he had stolen the Black BMW SUV and they all drove back to Connecticut in the BMW, leaving the Honda Civic behind.  According to Outing, they arrived back in Connecticut at approximately 5:00 a.m. and stopped in the Tre area of New Haven. Outing said that SUGGS, BARNES and "Lil Dude" then entered a residence and returned to the BMW with two firearms with long magazines. He claimed that he was dropped off before any shooting.  Shown the Ring doorbell footage from 140 Mill Street, Outing identified himself as the party who exited the driver seat of the BMW and reported that Devin SUGGS was the one who entered the front passenger seat. He claimed that he had been picked up by Devin SUGGS just before and that Devin SUGGS seemed shaky and wanted Outing to drive. Outing identified Devin SUGGS as the person standing in the BMW and shooting through the sunroof from a still image made from surveillance video.

88.     Hamden Police investigators obtained state cell site search warrants for the Outing's and SUGGS' phone, and the data shows that Outing and SUGGS were both in Scarsdale, New York, at the exact time when the car was stolen within 100 meters of the car. They were both also together the next day in New Haven right where the shooting started near Ashmun Street and

USAO_010279

T.H.'s residence before the shooting started. Both then either did not use, or disabled, their telephones during the time of the car chase and shooting.

89.     In addition to Outing's statements that the group that traveled to Scarsdale, New York and stole the BMW, a Grand Jury witness testified that Outing, Devin SUGGS, Emerson Harrington, and Exit 8 associate Jabari Newman went to New York to steal cars and picked up a BMW with a "peanut butter" interior. The witness described the car as blue instead of black, but all other statements made by the witness in relation to this incident appear to be accurate. According to the witness, upon returning to Connecticut, the group picked up BARNES and then Newman and Harrington were dropped off. The witness testified that BARNES, Devin SUGGS, and Outing continued driving the BMW and saw T.H. getting into a car. They followed him and started shooting at him from New Haven to Hamden. T.H. was shot in the head. While the witness was not present for the shooting, one of the participants told the witness immediately after the shooting what had happened.

90.     Based upon all of the foregoing facts, as well as my training and experience and that of other law enforcement personnel participating in this investigation, there is probable cause to believe that HILL and BARNES are currently in possession of **Subject Telephone 1** and **Subject Telephone 2**, respectively. The requested information will be used to locate HILL and BARNES for purposes of executing the currently pending arrest warrants.

91.     Based on my training and experience, I am aware that persons who utilize cellular telephones usually keep the cellphone on their physical person or within arms' reach. The CW has recently advised that throughout July 2023, the CW continued to have regular contact with HILL on **Subject Telephone 1**, and with BARNES on **Subject Telephone 2**. The CW has further stated that HILL and BARNES carry their telephones on their person and regularly communicate

USAO_010280

with each other to plan Exit 8 gang activities and to coordinate acts of violence against opposition members. As indicated above, I know that **Subject Telephone 1** is subscribed to Roderick HILL, whom I know to be HILL'S father, at an address believed to be HILL's residence. I also know that **Subject Telephone 2** is registered directly to BARNES.

92.    As indicated above, the **Subject Telephones** are being monitored by law enforcement via pen registers. As of August 1, 2023, the **Subject Telephones** continue to make and receive calls and text messages. From the limited amount of data, I have observed a number of calls from the Connecticut Department of Corrections – incarcerated persons, as well Exit 8 gang members and associates, to include Janiya Harvin-Kelly, Jarel DELGADO, Seny Toure, and Nygere Evans. For the **Subject Telephones**, the majority of the indicated use is listed as data, leading me to believe that, while the **Subject Telephones** are making a limited number of traditional 2G calls and text messages, the **Subject Telephones** remain active most of the day, with quiet periods which appear to be when BARNES and HILL are asleep.

<u>**Cell-Site Data and E-911 Phase II/GPS Location Data**</u>

93.    In my training and experience, I have learned that the Service Providers are companies that provide cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in

Page **33** of **36**

some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

### Manner of Execution

94.     In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

95.     To facilitate execution of these warrants, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the **Subject Telephones** or receiving signals from cellular devices, including the **Subject Telephones**. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the **Subject Telephones** and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the **Subject Telephones** and use that information to determine the **Subject Telephones'** location, even if they are located inside a house, apartment, or other building. The device will not intercept the contents of the **Subject Telephones'** communications, such as telephone calls, text messages, and other electronic communications. Further, the device will not collect any other data stored on the

USAO_010282

**Subject Telephones**, including e-mails, text messages, contact lists, images, or Global Positioning System (GPS) data.

96.     The investigative device may interrupt cellular service of phones or other cellular devices within its range. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the **Subject Telephones**, the device may briefly exchange signals with all phones or other cellular devices in its range. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the **Subject Telephones**, and law enforcement will limit collection of information from devices other than the **Subject Telephones**. To the extent that any information from a cellular device other than the **Subject Telephones** is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the **Subject Telephones** from all other cellular devices.

**Authorization Request**

97.     Based on the foregoing, I request that the Court issue the proposed warrants, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. The proposed warrants also will function as pen register orders under 18 U.S.C. § 3123. The information obtained pursuant to these warrants will be used to locate BARNES and HILL for purposes of executing the arrest warrants.

98.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrants to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrants may have an adverse result,

USAO_010283

as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscribers or users of the **Subject Telephones** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachments B-1 and B-2, which is incorporated into the warrants, the proposed search warrants do not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrants authorize the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

99.     I further request that the Court authorize execution of the warrants at any time of day or night, owing to the potential need to locate the **Subject Telephones** outside of daytime hours.

100.    A search warrant may not be legally necessary to compel the investigative technique described herein. Nevertheless, I hereby submit this warrant application out of an abundance of caution.

Respectfully submitted,

Michael Oppenheim
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to before me this 2ⁿᵈ day of August, 2023. at Bridgeport, CT.

THE HON. S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

USAO_010284

**ATTACHMENT A-1**

1.  This warrant authorizes the use of the electronic investigative technique described in Attachment B-1 to identify the location of the cellular device assigned phone number 475-321-1036, whose wireless provider is Cellco Partnership d/b/a Verizon Wireless, and whose listed subscriber is Roderick Hill.

A-1

USAO_010285

**ATTACHMENT B-1**

Pursuant to an investigation of Antwan HILL, a.k.a. "Bandz," other Exit 8 gang members, and others still unknown or not yet fully identified, for violations of the Title 18, United States Code, Section 1962(d) and 1963(a) (Racketeering Conspiracy); Title 18, United States Code, Section 1959(a)(3), 1959(a)(5) and 1959(a)(6) (VCAR Assault with a Dangerous Weapon, VCAR Attempted Assault with a Dangerous Weapon, and VCAR Attempted Murder); and Title 21, United States Code, Section §§ 841(a)(1), 841(b)(1)(B), 841(b)(1)(C), and 846 (Conspiracy to Distribute and to Possess with Intent to Distribute Fentanyl and Cocaine) (hereafter referred to as the "Target Offenses"), this Warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A-1 by collecting and examining:

1. radio signals emitted by **Subject Telephone 1** for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2. radio signals emitted by the **Subject Telephone 1** in response to radio signals sent to the cellular device by the officers;

for a period of thirty days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).

B-1

USAO_010286

**ATTACHMENT A-2**

1.  This warrant authorizes the use of the electronic investigative technique described in
    Attachment B-2 to identify the location of the cellular device assigned phone number 203-
    434-5964, whose wireless provider is AT&T, and whose listed subscriber is Nyzaire
    BARNES.

USAO_010287

**ATTACHMENT B-2**

Pursuant to an investigation of Nyzaire BARNES, a.k.a. "Melo," other Exit 8 gang members, and others still unknown or not yet fully identified, for violations of the Title 18, United States Code, Section 1962(d) and 1963(a) (Racketeering Conspiracy); Title 18, United States Code, Section 1959(a)(3), 1959(a)(5) and 1959(a)(6) (VCAR Assault with a Dangerous Weapon, VCAR Attempted Assault with a Dangerous Weapon, and VCAR Attempted Murder); and Title 21, United States Code, Section §§ 841(a)(1), 841(b)(1)(B), 841(b)(1)(C), and 846 (Conspiracy to Distribute and to Possess with Intent to Distribute Fentanyl and Cocaine) (hereafter referred to as the "Target Offenses"), this Warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A-2 by collecting and examining:

1.  radio signals emitted by **Subject Telephone 2** for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2.  radio signals emitted by the **Subject Telephone 2** in response to radio signals sent to the cellular device by the officers;

for a period of thirty days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).

B-2

USAO_010288